**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gregory Rivera, | No. CV-21-00416-PHX-DLR |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| Forsythe Family Farms Incorporated, | |
| Defendant. | |

The Court took this matter under advisement following a bench trial on September 20 and 21, 2022. At issue are Plaintiff Gregory Rivera's equitable claims of unjust enrichment and promissory estoppel, and Defendant Forsythe Family Farms Incorporated's claims for unjust enrichment and breach of contract. After considering the evidence presented and the parties' arguments, the Court makes the following findings and conclusions of law.

**I. FINDINGS OF FACT**

1. Plaintiff has been an alfalfa (or hay) farmer in Arizona for over 45 years.

2. From 1966 until September 13, 2019, Defendant owned approximately 43 acres of property located at 51st Avenue and Bethany Home Road in Maricopa County, Arizona (the "Property").

3. Defendant purchased the Property in 1996 and intended to construct a warehouse on it, which would be leased to Indeck Power Equipment Company ("Indeck") as a distribution warehouse. Indeck is a manufacturer and distributor of industrial boilers.

4. Defendant sold the Property in 2019 without improvements.

5. Marsh Forsythe is Defendant's Director and Vice President.

6. Forsythe had exclusive authority to bind and speak on behalf of Defendant.

7. Carol Dallain and Wendy Cesario served as Forsythe's personal assistants. Amie Woolen served as a bookkeeper for Defendant in southern Illinois. None had actual or apparent authority to bind Defendant or speak on its behalf.

8. Forsythe acted as Defendant's property manager for the Property. She had no farming experience. The Property is the only property owned by Defendant with which Forsythe had any involvement.

9. Although Forsythe is an experienced businessperson, she managed the Property remotely because it was vacant. The Property was not her primary concern.

10. Occasionally, Defendant received complaints from neighbors of the Property regarding weeds, dust, illegal dumping, and transients, and received code violation notices from the City of Glendale. The Property was notorious for dumping. The Property required increasing attention, and a need for caretaking arose.

11. For many years, while under Forsythe's management, the Property remained vacant even though if farmed it could have qualified for an agricultural designation resulting in approximately $80,000.00 per year in reduced taxes.

12. On July 8, 2011, Plaintiff called Defendant's office and spoke with Dallain to inquire about leasing the Property for farming. Dallain conveyed this information to Forsythe (fka Fournier) and advised her that Plaintiff indicated that there could be a tax savings if the Property is farmed.

13. On November 30, 2011, Plaintiff emailed Dallain and again inquired about leasing the Property to farm alfalfa. Plaintiff advised that the benefits of leasing the Property to be farmed included deterring people from dumping on the Property, an agricultural tax exemption that would reduce the yearly property taxes from $90,000.00-$100,000.00 to $5,000.00-$10,000.00, and an alfalfa crop would keep the Property dust free.

14. Between 2011 and 2014, Plaintiff had discussions with Forsythe and her staff about leasing the Property.

15. Forsythe claims that she was aware of agricultural classification tax benefit.

16. Forsythe did not understand the significance of the tax benefit. Had Forsythe known the significance of the tax savings, Forsythe would not have chosen to let the Property sit idle, missing the advantage of the significant tax relief of a farming designation.

17. Under Forsythe's management, Defendant paid property taxes on the Property for almost twenty years at a much higher tax rate than if it were farmed, resulting in the payment of more than a million dollars in property taxes that could have been avoided.

18. Eventually, in early 2014, recognizing that the farming the Property could result in significant tax savings and because the property needed caretaking, Forsythe agreed to allow Plaintiff to farm the Property and promised to prepare the lease.

19. In February 2014, Plaintiff began occupying the Property, clearing it, and planting crops.

20. Over the next few months, Plaintiff communicated with Defendant's representatives, including Forsythe and Dallain, questioning the status of the written lease.

21. On April 7, 2014, Plaintiff again emailed Forsythe to inquire about the status of the lease, and to move it along, proposed that the parties use the "basic two-page one" Plaintiff had sent her.

22. Plaintiff occupied and prepared the Property for farming for five months before Forsythe produced a written lease.

23. On or about July 16, 2014, the parties executed the written lease dated August 15, 2013 ("2013 Lease") which tracked the parties' oral agreement.

24. The 2013 Lease had a four-year term with $1.00 per year rent for the first two years and $2,150.00 per year rent for the third and fourth years.

25. The parties agreed there was not actually a fourth year due to the 2013 Lease being executed on July 16, 2014 (with a start date of August 15, 2013). The $1.00 rental rate was a nominal payment and Defendant never asked that it be paid.

26. The Court does not find credible Forsythe's testimony that the tax benefit of $80,000.00 per year was not an important factor in her decision to have Plaintiff farm the Property. Defendant entered the 2013 Lease primarily to have a caretaker on the land and to receive the tax benefits. The tax savings was a primary motivating factor behind Defendant's decision to enter the 2013 Lease.

27. To qualify for agricultural tax classification, the Property had to be farmed for three out of the last five years.

28. The parties agreed to backdate the 2013 Lease to August 15, 2013, so Defendant could realize the tax benefit sooner, even though Plaintiff had not started farming until February 2014.

29. On or about June 9, 2015, Defendant submitted its Agricultural Land Use Application to Maricopa County.

30. The County granted the new agricultural classification effective September 2016, based on the backdated 2013 Lease.

31. On April 25, 2016, Forsythe, now aware of the significant tax consequences of the classification, asked her staff to verify the agricultural reclassification stating: "Please make sure they have the correct mailing address and it was approved. We have been farming it for years. See if the farming classification and resultant taxes went thru and advise please."

32. The following day, the Maricopa County Tax Office confirmed reclassification.

33. Because of Plaintiff's farming on the Property, Defendant realized approximately $80,000 per year in tax savings during 2016 and 2017.

34. The receipt of rent of $1.00 per year the first two years of the 2013 Lease was not a factor in Defendant's decision to enter the 2013 Lease. Likewise, the receipt of $2,150.00 per year rent the last two years of the 2013 Lease was not a significant factor.

1  Comparatively, the rent amounted to less than 3% of what Defendant realized from tax
2  savings.
3        35. In December 2016, Plaintiff and Forsythe had a conversation about a Notice of
4  Violation from the City of Glendale. During that conversation, Plaintiff requested, and
5  Forsythe agreed, that rent would be reduced to $1.00 per year after the property taxes were
6  reduced.
7        36. The 2013 Lease expired by its own terms on August 14, 2017, but both parties
8  appeared to be confused about the termination date.
9        37. Prior to August 14, 2017, Defendant gave no written notice of default nor made
10 any demand upon Plaintiff for payment of rent.
11       38. Sometime in 2017, Plaintiff contacted Defendant about renewing the 2013 Lease
12 but did not receive a response.
13       39. Plaintiff vacated the Property in late 2017.
14       40. As is standard in the industry, when he vacated the Property, Plaintiff removed
15 his trade fixtures, irrigation piping, gates, ditch tins and tarps (collectively "irrigation
16 system") that he had installed in 2014.
17       41. However, the irrigation system belonged to Defendant because the 2013 Lease
18 provided in Paragraph 9 that "[A]ny additions to, or alterations of, said premises shall
19 become at once a part of the reality and belong to Lessor [Defendant]."
20       42. Plaintiff halted the delivery of irrigation water from Salt River Project ("SRP").
21 Without irrigation, Plantiff's crops died.
22       43. For extended periods of time, Forsythe did not visit the Property.
23       44. After the 2013 Lease expired and Plaintiff had vacated the property, Forsythe
24 relied on a friend named Sherry to drive by the Property on one occasion to see if it was
25 being farmed.
26       45. Sherry reported that when she drove by the Property, she observed that there
27 was "active farming" taking place and told Forsythe that she took pictures with her cell
28 phone.

46. Although Sherry never produced the pictures, Forsythe relied on Sherry's alleged observations and believed that Plaintiff never stopped farming the Property. Forsythe believed Plaintiff continually actively farmed the Property through 2017 and into 2018.

47. Forsythe's belief turned out to be mistaken; it is contradicted, rather than supported, by evidence.

48. Forsythe's sole alleged witness to the "active farming" of the Property, Sherry, failed to appear for trial.

49. Photographs of the "active farming" allegedly taken by Sherry were not offered as evidence at trial.

50. Documents subpoenaed from SRP confirmed that there was no water delivered to the Property between November 14, 2017, and April 19, 2018.

51. The Property could not be farmed without irrigation.

52. Aerial photographs of the Property from www.google.com/earth showed the various stages of crops on the Property. A photograph taken December 23, 2017, showed that the crops were mostly dead and a February 24, 2018 photograph showed no visible crops growing on the Property at that time. Photographs taken on March 9, 2018, confirmed that no crops were growing at that time.

53. Although he had left the Property and his crops had died, Plaintiff remained interested in farming the Property again.

54. Plaintiff called Defendant in January 2018 to discuss a renewal lease. On or about January 12, 2018, Plaintiff emailed Forsythe requesting that she call him to discuss the farmland in Glendale.

55. On January 25, 2018, at Cesario's request, Plaintiff provided a copy of the 2013 Lease, writing: "Wendy, here is a copy of the lease that you asked for. Please have Marsha call me at her earliest convenience."

56. Plaintiff made numerous calls to Forsythe's office in February 2018 to ask about entering into a new lease agreement.

57. On March 9, 2018, Plaintiff emailed Forsythe asking that she call him about his farming of the Property.

58. On March 9, 2018, Plaintiff and Forsythe had a telephone conversation (the "March 9 conversation") during which Plaintiff advised Forsythe that he had vacated the Property because he had not received a response about a lease renewal after the 2013 Lease expired. He expressed his desire to enter into another lease.

59. Forsythe, believing her friend Sherry's report that the Property was being actively farmed, believed that Plaintiff was lying when he told her he was off the Property.

60. Forsythe was not "the nicest to [Plaintiff]" in that conversation.

61. However, Forsythe agreed to enter into another lease following the format of the 2013 Lease.

62. The parties believed (possibly mistakenly) that it was necessary that the Property be continuously farmed for Defendant to qualify for the agricultural tax benefit and therefore agreed that it was important there be no break in the lease.

63. Although they disagreed about the rent from the 2013 Lease, they ultimately agreed that Plaintiff would pay $2,150.00 when the new lease was presented to him for signature.

64. Believing that continuous farming was necessary for the tax benefit, the parties agreed that Plaintiff would return to farming the Property immediately.

65. Forsythe stated that she would prepare a new lease.

66. Although she had a lease agreement prepared, apparently not trusting Plaintiff based on Sherry's report of his continued farming, she did not present it to Plaintiff.

67. Although Forsythe told Plaintiff she would prepare and present him with a new lease, when she decided not to do so she did not tell Plaintiff.

68. Months passed without Forsythe providing the lease agreement, but Plaintiff was not concerned about the delay because historically that had been Forsythe's practice. It took over five months after Plaintiff started farming in 2014 to receive the 2013 Lease.

69. At trial, the parties disputed what they had agreed to concerning the due date for $2,150.00 payment.

70. Plaintiff testified that the parties agreed the payment would be due "upon signing" of a new lease.

71. Plaintiff's conduct after the phone agreement is consistent with his testimony about the parties' agreement.

72. Soon after the conversation, relying on the agreement, Plaintiff re-entered the Property and invested the material and equipment to resume farming alfalfa.

73. Forsythe disputed Plaintiff's testimony and testified that their agreement provided that the $2,150.00 was due immediately and that her obligation to prepare the new lease did not arise until he paid the past rent.

74. Forsythe testified that, in their March 9 telephone conversation, she told Plaintiff that he had no authority to use the Property for farming operations until the new lease was signed.

75. Forsythe's conduct after the phone conversation was not consistent with her testimony about the agreed-on terms of the lease.

76. Forsythe's conduct after the phone conversation was consistent with Plaintiff's testimony about his understanding of the agreed-on terms of the new lease.

77. On March 9, 2018, after the phone conversation, Forsythe instructed Steve Page in her office to prepare a new lease.

78. Her instructions to Page were inconsistent with her trial testimony but tracked the testimony of Plaintiff about the terms of the agreed-upon lease.

79. Defendant's internal documentation supports Plaintiff's testimony as well.

80. Following her March 9, 2018 conversation, Forsythe instructed Page to prepare a new lease based on the old 2013 format to include the following: (1) no break in the lease period, (2) Plaintiff will pay $2,150.00 for past due rent upon signature of the new lease

81. The draft lease prepared by Page, which was never sent to Plaintiff, includes the following provision in paragraph 4: "Lessee also agrees to pay Two Thousand One

Hundred Fifty Dollars ($2,150.00) for full and final payment of all past due rents which is in addition to the four years of rent noted above and is due upon the signing of this Lease Agreement."

82. The draft lease was consistent with Plaintiff's testimony concerning his conversation with Forsythe. He had not seen the draft lease prior to this litigation.

83. At trial, Forsythe disputed her own email, testifying that her trial testimony correctly described the parties' agreement and that her email to Page was wrong and was "poorly" worded.

84. Soon after her March 9, 2018, phone conversation with Plaintiff, Forsythe checked to verify the tax savings.

85. Forsythe never informed Page that the "due upon signing" language included in his draft lease was wrong and that it was not what she and Plaintiff had agreed to.

86. Forsythe did not notify Plaintiff that she was waiting for the rent payment before sending him the new Lease.

87. Forsythe testified that she did not send the new lease to Plaintiff because Plaintiff had not paid $2,150.00 and because she believed Plaintiff had lied when he told her he had vacated the Property months ago. She believed Plaintiff never left the Property before the March 9, 2018, conversation.

88. Plaintiff resumed farming, reasonably relying on Forsythe's promises that they had reached an agreement to enter a new lease consistent with the terms set forth above, that she would prepare the written lease agreement, and that the $2,150.00 would be due when the written lease agreement was presented to and signed by Plaintiff.

89. Although Plaintiff restarted his active farming of the Property soon after the March 9, 2018, conversation, Forsythe never sent Plaintiff a demand for payment, nor did she demand that he vacate Property until January 31, 2019.

90. On January 31, 2019, Forsythe sent Plaintiff a notice of default and demand to vacate.

91. The demand to vacate advised Plaintiff that he had no right to enter the Property or remove anything from the Property, and if he did, it would be considered "theft" and Defendant would notify law enforcement.

92. After receiving the demand, Plaintiff vacated the Property, leaving behind his growing crops and the irrigation system.

93. Although in April 2018 Plaintiff re-installed the improvements necessary for farming operations that he had removed in late 2017, Forsythe contended at trial that Plaintiff had not stopped farming and had not removed his equipment.

94. Contrary to the documentary evidence that overwhelmingly proved Plaintiff had removed his equipment and had stopped farming the Property in 2017, and then reinstalled it after the March 9 conversation, Forsythe disagreed.

95. Forsythe testified that she had "investigated" that issue but admitted that her only investigation was to ask the replacement tenant how long the irrigation system had been in the ground and the replacement tenant was unable to answer that question.

96. Forsythe testified that she was not aware of Arizona law concerning a landlord's obligation to notify the county that property was no longer used for agricultural purposes, or the penalty for failing to do so.

97. Plaintiff performed under the parties' oral agreement to enter a new lease. He again cleared the Property, installed improvements for irrigation and planted a new crop. It was a five-year crop even though the parties had agreed upon a four-year lease term.

98. The proposed term of the new lease was August 15, 2017, through August 14, 2021.

99. Defendant sold the Property in 2019 and the replacement tenant's last cutting was in November 2020. At the trial, Plaintiff stipulated that the cutoff date for his damages was November 2020 (as opposed to August 2021).

100. Plaintiff testified about detailed tasks performed to prepare the Property for planting and to plant the seed in Spring 2018, the approximate number of hours incurred and the standard hourly rate for each task. The work was performed by Plaintiff's crew at

a standard Maricopa County hourly rate for that type of work. The cost to prepare the Property, including the cost of seed, was $59,327.96. However, because of Plaintiff's failure to comply with the disclosure requirements of Federal Rule of Civil Procedure 26(a)(1)(A)(iii) regarding receipts for the seed, pursuant to Rule 37(c)(1), the Court will not consider the evidence of the $18,000.00 cost of seed. Subtracting the cost of seed, Plaintiff's damages for the cost to prepare the Property totals $41,327.96.

101. The irrigation system is a trade fixture that a farmer typically removes at the termination of a lease. However, Paragraph 19 of the 2013 Lease provides in pertinent part that "any additions to, or alterations of, said premises shall become at once a part of the realty and belong to the Lessor." The irrigation system is arguably a trade fixture and removable by the farmer, but because the parities had agreed that additions to the Property belong to the lessor, the $39,746.11 cost to reinstall the irrigation system is not a damage recoverable by Plaintiff.

102. Plaintiff's testimony concerning the bales that he harvested, and the bales harvested by the replacement tenant was based on personal knowledge. Plaintiff went to the Property and counted each of the bales at harvest time during his occupancy and during the occupancy of the replacement tenant. As a result of the demand to vacate, Plaintiff lost 22 months of harvesting (February 2019 through November 2020).

103. Plaintiff and the replacement tenant harvested an average of 10,000 bales per year. During the time the replacement tenant occupied the Property, the retail price per bale was $14.00. Plaintiff's harvesting would have yielded approximately $140,000.00 in retail sales (10,000 bales per year x $14.00 per bale). The cost associated with each bale is $7.00 per bale (for fertilizer, water, and labor to harvest). Plaintiff would have realized $70,000.00 in the two years he would have farmed the Property. Because Plaintiff would have harvested for 22 months until the Property sold (February 2019 through November 2020), the pro rata amount of lost income (22 months ÷ 24 months) is $64,166.67.

## II. CONCLUSIONS OF LAW

1. The doctrine of promissory estoppel applies to a contract otherwise barred by the statute of frauds where a party promises to put the agreement in writing. *See Mullins v. S. Pac. Transp. Co.*, 851 P.2d 839, 841 (Ariz. Ct. App. 1992).

2. Plaintiff has established the four elements of promissory estoppel:

(a) *A clear and unambiguous promise.* Forsythe promised to enter into a new lease along the terms of the 2013 Lease. The clear terms of promised lease included the agreement that Plaintiff was to immediately return to farming the Property, Forsythe would prepare the lease and a rental payment from the previous lease would be paid at the time Plaintiff signed the new lease. This promise was confirmed by Forsythe's internal email dated March 9, 2018 (where she outlined the terms of the agreement) and Page's March 15, 2018 email, wherein he included a draft of the new lease (based on the format of the 2013 Lease).

(b) *Reliance*. Relying on Forsythe's promise, Plaintiff re-entered the Property, re-installed improvements, and re-planted alfalfa. Aerial photos confirm that the crops were dying by the end of December 2017 and the Property was bare of crops by the end of February 2018. The SRP records confirmed that Plaintiff had stopped all irrigation between November 2017 and April 2018. An aerial photo taken on August 28, 2018, showed that Plaintiff had resumed farming and the Property had alfalfa crop.

(c) *Reasonable and foreseeable reliance*. Forsythe had authority to make the promise to enter into a written lease. Her promises were specific, and the parties had a history of dealing. Forsythe's primary concern when she orally set the terms of new lease was preserving the agricultural status of the Property. To continue to receive the tax benefits of the agriculture status Forsythe believed that there could be no break in the farming on the Property. Forsythe promised that if Plaintiff re-entered the Property, began farming immediately, and agreed to backdate the lease to show no break, she would enter into a new lease agreement and prepare the

written lease. This was the same procedure Forsythe had employed when the parties executed the 2013 Lease. Obtaining the agricultural status as soon as possible was also priority in 2014. In 2014, Plaintiff entered the Property immediately after the parties reached an oral agreement. Although it took Forsythe five months, she eventually came up with the written 2013 Lease, which contained the terms agreed upon orally. The 2013 Lease was executed by the parties and backdated, as agreed, to assist Defendant with its agricultural status for tax purposes. After the oral agreement but before the written lease had been signed, in reliance on Forsythe's promise to enter into the 2013 Lease, in 2014 Plaintiff invested substantial money and time to start farming the Property. It was reasonable and foreseeable that Plaintiff would believe that Forsythe had the authority to agree to enter into a lease and the terms, intended to honor her word, and that she would prepare and enter the new written lease following same procedure she employed when the parties entered the 2013 Lease.

(d) *Injustice can only be avoided by enforcement of the promise*. Plaintiff incurred significant costs preparing the Property for farming and actually farmed it, which resulted in a tax savings of approximately $160,000.00 to Defendant for 2018 and 2019. Plaintiff lost expected profits from harvesting the alfalfa he had planted. There is no defense of unclean hands. The parties agreed that any rent owed under the 2013 Lease would be paid upon signature (execution) of the new lease. Defendant never provided the new lease to Plaintiff but knew that he was relying on the promises made in the March 9 phone conversation and allowed him to invest his time and money and spend months farming the Property before demanding that he vacate.

3. Plaintiff did not breach the 2013 Lease. Plaintiff and Defendant agreed that the amounts owed under the 2013 Lease would be due upon execution of the new lease. Forsythe's email confirmed that she asked her assistant to prepare a new based on the old 2013 format for $2,150.00 per year plus past due rent of $2,150.00 due "upon signature of

the new Lease." Defendant failed to present the new lease to Plaintiff and therefore prevented Plaintiff's performance.

4. Although the statute of frauds defense applied to Plaintiff's breach of contract claim because he was only seeking monetary damages under the new lease, that analysis does not apply to the 2013 Lease. The parties' agreement to enter into the new lease extended the deadline for payment under the 2013 Lease. That agreement provides Plaintiff an equitable defense to Defendant's breach of contract claim. That defense is not barred by the statute of frauds.

5. Defendant's claim that Plaintiff was in breach of the 2013 Lease is not supported by the evidence. Additionally, the alleged breaches are not material. Defendant received its $80,000.00 per year in tax savings. Plaintiff suffered forfeiture. No demand to perform was ever made. Plaintiff acted in good faith.

6. Quantum meruit damages are available when services are performed under an unenforceable contract or when they are rendered in the absence of a contract. *Blue Ridge Sewer Improvement Dist. v. Lowry and Assocs., Inc*., 718 P.2d 1026, 1028 (Ariz. Ct. App. 1986).

7. In Arizona, uncertainly as to the amount of damages does not preclude recovery, though there must be a reasonable basis in evidence for the trier of fact to fix compensation. *See Broadway Realty & Trust, Inc. v Gould*, 665 P.2d 580, 582 (Ariz. Ct. App. 1983).

8. Plaintiff is entitled to direct damages for preparing the Property to farm in the Spring of 2018 plus lost profits.

9. Plaintiff testified with personal knowledge concerning his damages. Plaintiff testified that he personally counted the bales, would make notations on whatever paperwork was available in his truck and then input the information on a spreadsheet.

10. Plaintiff has been a hay farmer for over 45 years and farmed this Property for four years before he was forced to vacate. He testified concerning his lost profits.

11. Plaintiff was not allowed under the 2013 Lease to remove his irrigation system. Section 9 of the 2013 Lease states that additions or alterations to the Property belong to the Landlord.

12. Plaintiff did not breach the 2013 Lease. Although there is no breach of the 2013 Lease, Plaintiff's equitable claims are offset by the rent that would have been paid had the new lease actually been executed (this includes $2,150.00 for the amount requested under the 2013 Lease plus each year for 2018, 2019 and 2020). Defendant is entitled to the following credit against Plaintiff's damages:

| | |
|---|---|
| 2013 Lease | $2,150.00 |
| 2018 | $2,150.00 |
| 2019 | $2,150.00 |
| 2020 | $2,150.00 |
| | $8,600.00 |

13. The Court finds that Plaintiff has met his burden of proof to establish his claim against Defendant for promissory estoppel.

14. The Court further finds that Plaintiff has established the following damages:

| | |
|---|---|
| $41,327.96 | For preparation and planting (this amount is minus the cost of seed) |
| $64,166.67 | For loss of profits during the 22 months lost. |
| -$8,600.00 | Rent (for 2013, 2018, 2019, and 2020) |
| $96,894.63 | Net damages |

15. Because the Court finds in favor of Plaintiff on his primary claim of promissory estoppel, affording him complete relief, the Court need not address Plaintiff's alternative claim of unjust enrichment.

**IT IS ORDERED** that Plaintiff shall be awarded $96,894.63 in damages against Defendant on his claim for promissory estoppel.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Reconsider Regarding Admission of Exhibits 19 and 20 (Doc. 65) is **DENIED**.

**IT IS FURTHER ORDERED** that within **14 days** of the date of this order, Plaintiff shall submit a proposed form of judgment and, if appropriate, an application for an award of attorney fees and costs.

Dated this 3rd day of January, 2023.

Douglas L. Rayes
United States District Judge